**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 19-CR-10104-ADB |
| DARIUS CARTER, | |
| Defendant | |

### GOVERNMENT'S MEMORANDUM IN SUPPORT OF MOTION FOR DETENTION[1]

The government hereby files this memorandum in support of its motion to detain the

Defendant, Darius Carter (the "Defendant").  The defendant's trial is less than sixty days away.

This defendant robbed a store at gunpoint, and then fired his weapon at police officers.  Put

plainly, the defendant presents a tremendous danger to the community, and witnesses, a

pronounced risk of flight given the facts of this case and his past defaults and unwillingness to

come to court.  As the facts of this case and the defendant's criminal history demonstrates, no

conditions of release can assure the safety of the community or particular witnesses in this case,

or prevent him from committing additional crimes.  The defendant must be detained.

The defendant's motion solely refers to the potential of an outbreak of COVID-19 at

Wyatt.  Cf. ECF #221. Moreover, the defendant does not claim to suffer from any condtition that

would make him at greater risk of complications related to COVID-19. As such, in light of the

danger posed by the defendant, the COVID-19 pandemic is no reason to release him.

---

[1] The government makes reference to the Exhibits filed previously in opposition to the codefendant's Motion to Revoke Detention Order.  See ECF #83 (opposition), 83-1 (transcript of codefendant's detention hearing), ECF #86-1 through 86-19 (exhibits admitted at detention hearing).  References to exhibits submitted in support of this opposition are by exhibit number and page, where appropriate, e.g., Ex. _, p. _.  The government assumes the Court has access to the Defendant's criminal history through the pretrial services report.

## BACKGROUND

### I.   PROCEDURAL HISTORY

On March 27, 2019, a Grand Jury sitting in the District of Massachusetts indicted the

defendant and two codefendants.  The defendant was arraigned on April 5, 2019, and the

government moved for detention, on the grounds of dangerousness, risk of flight and serious risk

of obstruction of justice. [ECF #12].

On September 11, 2019, a Grand Jury returned a Superseding Indictment, charging the

defendant with the following offenses:

- Count One, Conspiracy to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951(a);

- Count Two, Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951(a);

- Count Six, Discharging, Brandishing, Using and Carrying a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c);

- Count Seven, Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1); and

- Count Eight, Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1).

ECF #55.

On October 3, 2019, the Defendant's case was set for trial to commence on June 1, 2020.

[ECF #77].

On March 2, 2020, the codefendant, Diovanni Carter, proceeded to a separate trial.  After

a two-week trial, a jury convicted Diovanni Carter of Conspiracy to Interfere with Commerce by

Robbery, in violation of 18 U.S.C. § 1951(a), Interference with Commerce by Robbery, in

violation of 18 U.S.C. § 1951(a), and Discharging, Brandishing, Using and Carrying a Firearm in

Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c). [ECF #211].  Sentencing is

scheduled for July 7, 2020.  [ECF #212].

On April 3, 2020, the defendant filed the instant motion for a detention hearing.

[ECF #223], seeking release on the basis of COVID-19. The defendant does not claim to suffer

from any particular medical condition that makes more susceptible to COVID-19 or that would

signify a greater risk for complications.  Cf. ECF #223.

## II.      GROUNDS FOR DETENTION

The government seeks detention of Defendant, Darius Carter on the following grounds:

- 18 U.S.C. § 3142(f)(1)(A), because Interference with Commerce by Robbery is a crime of violence;[2]

- 18 U.S.C. § 3142(f)(1)(B), because Discharging, Brandishing, Using and Carrying a Firearm in Relation to a Crime of Violence, carries a maximum penalty of life imprisonment;[3]

- 18 U.S.C. § 3142(f)(1)(D), because the defendant has been convicted of armed robbery, assault dangerous weapon, and animal cruelty, which are crimes of violence (armed robbery also carries a life imprisonment maximum);

- 18 U.S.C. § 3142(f)(1)(E), because the defendant is charged with felonies that involve the possession or use of a firearm;

---

[2] Interference with Commerce by Robbery (Hobbs Act robbery) is categorically a crime of violence under the force clause because it "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  See United States v. Garcia-Ortiz, 904 F.3d 102, 109 (1st Cir. 2018) ("we therefore hold that because the offense of Hobbs Act robbery has as an element the use or threatened use of physical force capable of causing injury to a person or property, a conviction for Hobbs Act robbery categorically constitutes a 'crime of violence' under section 924(c)'s force clause"); 18 U.S.C. § 3156(a)(4) (same force clause definition of crime of violence as Section 924(c)).

[3] See United States v. Shiflett, 715 Fed.Appx. 258, 260 (4th Cir. 2017) ("Congress did not specify any maximum sentence for any particular § 924(c)(1)(A) offense; rather, it provided a series of mandatory minimum sentences for various gun offenses. The absence in a statute of a maximum penalty has been consistently interpreted to mean that the maximum authorized sentence is life imprisonment.").

- 18 U.S.C. § 3142(f)(2)(A), because there is a serious risk that the Defendant will not return to Court if released; and

- 18 U.S.C. § 3142(f)(2)(B), because the defendant poses a serious risk of obstruction of justice.

Additionally, in this particular case a presumption arises under 18 U.S.C. § 3142(e)(3)(B), supporting the government's position that the defendant must be detained pending trial.  The defendant is charged with an offense under 18 U.S.C. § 924(c), and therefore, "it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3142(e)(3)(B).

## III.    FACTUAL BACKGROUND

On January 26, 2019, at about 7:11 p.m., three men armed with guns entered a T-Mobile store in Brockton (ECF #81-1, p. 8-15; ECF #86-2).  The store surveillance captured the incident and descriptions of the robbers (ECF #81-1, p. 8-15).  The first man, later identified to be the Defendant, Darius Carter,[4] was wearing a black sweatshirt with a white logo on the breast, black sweatpants with a white logo on the thigh, white gloves with black accents, and black and white Jordan sneakers (ECF #81-1, p. 8-15; ECF #86-2).  The second man, later identified to be Stephan Rosser-Stewart, wore a black top, jeans, fuchsia underpants (visible when he bent over), off-grey sneakers and carried a black duffel bag (ECF #81-1, p. 8-15; ECF #86-2).  The third man, later identified to be Dennis Martin, wore a navy blue sweatshirt, navy blue sweatpants and white sneakers (ECF #81-1, p. 8-15; ECF #86-2).

All three men also held firearms: the Defendant held a large frame silver firearm, later identified to be an Armi Fratelli 9mm; Rosser-Stewart held a small frame silver, later identified

---

[4] The government distinguishes the Carter brothers by first name.

to be a Jennings .22 caliber; and Dennis Martin held a black Ruger .380 caliber firearm with a

visibly extended magazine (ECF #81-1, p. 13).  As they entered the store, the Defendant and

Rosser-Stewart drew their firearms, pointed them at the employee, and directed him to the back,

where the inventory was kept (ECF #81-1, p. 8-15; ECF #86-2).  Martin entered last (ECF #81-1,

p. 8-13). While the robbery took place, Diovanni Carter remained in a rented white Chevrolet

Malibu that the robbers used to get to Brockton (ECF #81-1, p. 15, 19, 62-63).

While entering the code, the Defendant struck the employee in the head with his firearm

(ECF #81-1, p. 13).  Once in the back room, the employee opened the large cabinet that

contained the inventory of phones and tablets (ECF #81-1, p. 12-16).  Martin held the employee

at gunpoint, while Rosser-Stewart emptied the cabinet into the duffel bag (ECF #81-1, p. 12-16).

The Defendant went to the front of the store and checked another room (ECF #81-1, p. 11-16).

Martin obtained a clear plastic trash bag from a bin and the men put additional phones, tablets

and cash into that bag as well (ECF #81-1, p. 10-18).  As Rosser-Stewart bent over to place

phones in the bag, his pink/purple underpants were visible on the surveillance video.

Within three minutes, the men left the store with Martin carrying the clear plastic bag and

Rosser-Stewart carrying the duffel bag (ECF #81-1, p. 14-17).  In total, they stole approximately

$20,000 worth of cellular telephones and tablets, and approximately $4,500 in currency (ECF

#81-1, p. 10).  Among the stolen items was a covert tracking device that alerted a security

company when it travelled beyond the area of the store, and provided real-time tracking

information of its whereabouts to the security company (ECF #81-1, p. 16-19).

The three robbers got back into the white Malibu: Diovanni drove, Rosser-Stewart was in

the front passenger seat, Martin sat in the rear behind the driver's seat, and the Defendant sat in

the rear on the passenger side (ECF #81-1, p. 16-25).  The tracking device reported the location

and speed of the device as it travelled through downtown Brockton onto Crescent Street, and turning onto Lyman Street, at which point it entered a residential neighborhood (ECF #81-1, p. 19-22;).  This information was reported to Brockton Police who identified the white Malibu as the getaway vehicle and attempted to stop the car (ECF #81-1, p. 19-24).  The vehicle would not stop and travelled into the residential neighborhood, speed over 50 MPH, making quick turns on short streets (ECF #81-1, p. 19-25).  Ultimately, the Malibu turned onto Summer Street, a long, relatively straight road (ECF #81-1, p. 19-23).

While on Summer Street the tracking device reported speeds well over 70 MPH (ECF #81-1, p. 19-22).   The Defendant fired about five shots at the police, while Diovanni Carter urged him on.  See Exs. 5 & 6.  Following this, Rosser-Stewart fired one or two shots at the pursuing police officers.  The lead officer was only a few feet behind the Malibu, but was not hit (ECF #81-1, p. 21-28).  In fact, Rosser-Stewart shot the Defendant in the shoulder.  See Ex. 6, p. 56-57 (grand jury testimony discussing shooting after arrest), Ex 9 (booking photo showing bullet hole in shoulder).[5]

The City of Brockton ShotSpotter system, which is a series of microphones placed through the city that monitor and record sound frequencies consistent with gunfire, reported a total of eight gunshots being fired at 7:20 p.m. and located the source of the gunfire as Summer Street, consistent with the location of the tracking device at the time.  The lead officer pulled back, but continued to follow the Malibu as it turned onto Carl Avenue and came to a stop at the intersection of Carl Avenue and Bristol Avenue (ECF #81-1, p. 27-32; Ex. 5).[6]

---

[5] Tellingly, the Defendant refused a medical examination upon his booking at Plymouth County Correctional Facility.  See Ex. 19, p. 7.

[6] Brockton Police did not return fire (Tr. 28).

The occupants fled down the area of Bristol Avenue and officers were in pursuit (ECF #81-1, p. 27-32; ECF #86-1, 4).   Darius was apprehended shortly after abandoning the vehicle, in a wooded area across Baker Street (ECF #81-1, p. 29-32; ECF #86-4).   Darius was wearing the exact same clothing as depicted in the store video, but was not wearing gloves (ECF #81-1, p. 30-32; ECF #86-1, 10-11).[7]   Martin was arrested closer to the Malibu than Darius, at 44 Baker Street, hiding behind a fence (ECF #81-1, p. 29-30; ECF #86-4).  Rosser-Stewart was apprehended down the street in the area of 149 Carl Avenue (ECF #81-1, p. 35; ECF #86-4). During the booking process, the Defendant was captured on video wearing the same outfit he had worn in the store during the robbery.  See Exhibits 2, 8.

About five yards from where the Defendant was apprehended, the silver Armi Fratelli 9mm firearm (the firearm held by Darius), and the black Ruger .380 firearm with the extended magazine (the firearm held by Martin) were found wedged underneath a rock (ECF #81-1, p. 32-34; 86-12).  There was no ammunition in the Armi Fratelli and there were multiple rounds of .380 ammunition in the black Ruger (ECF #81-1, p. 32-37; 86-12).  A 9mm casing was recovered from Summer Street, and tool-marking comparisons identified the Armi Fratelli firearm as having fired the recovered 9mm casing (ECF #86-14). A few days after the robbery, a Jennings .22 caliber firearm was recovered in the area of Litchfield Street, close to where the Malibu was abandoned (ECF #81-1, p. 33-37; 86-4, p. 13).  This firearm was consistent with the firearm used by Rosser-Stewart, and matched the caliber of casing located in the front passenger seat (ECF #81-1, p. 34-36; ECF #86-4).

---

[7] In the rear passenger-side area of the Malibu, investigators found the white gloves with black accents that the Defendant wore during the robbery (ECF #81-1, p. 30-32, 35-36; 86-6, p. 10).

In the Malibu, investigators found mail addressed to Diovanni Carter, and a Hertz rental agreement identifying him as an authorized operator (ECF #81-1, p. 36-39; ECF #86-5, 7). In the front passenger area, investigators located a spent .22 caliber shell casing, a black jacket consistent with that worn by Rosser-Stewart during the robbery, and the black duffel bag containing phone and tablets and currency (ECF #81-1, p. 36-39; ECF #86-5). In the rear of the vehicle, investigators located the clear plastic trash bag containing the phones and tablets (ECF #81-1, p. 36-39; ECF #86-5). An inventory comparison was conducted and it was determined that all of the stolen items and the covert tracking device were recovered in the vehicle (ECF #81-1, p. 37-39; ECF #86-9). Investigators also lifted a fingerprint of Diovanni Carter from the rear passenger side door (ECF #81-1, p. 56).

Records from Hertz for the white Malibu revealed that the car had been rented on January 16, 2019, in the name of Carshana Graham (ECF #81-1, p. 38-40; ECF #86-7, 86-8). Though rented in the name of Graham, Diovanni Carter was listed as an authorized driver of the Malibu, and a phone number ending in 2207 was listed as a contact number (ECF #81-1, p. 39-40; ECF #86-8).

Investigators also learned that after the Malibu was abandoned, Diovanni Carter had a series of calls to and from a phone associated with a person identified as J.B.[8] (ECF #81-1, p. 52; ECF #86-16, p. 8). The calls were noted at 7:37 p.m., 7:46 p.m., and 7:43 p.m., which was after the vehicle was abandoned (ECF #81-1, p. 52; ECF #86-16, p. 8). J.B. resided at 82 Carl Avenue, which was approximately 300 yards from where the Malibu was abandoned, and a few houses down from where Rosser-Stewart was apprehended (ECF #81-1, p. 46-53; 86-4, 16).

---

[8] In accordance with the Local Rules, the government employs the initials for an unindicted coconspirator, and has redacted the name to the initials in the transcript. See LR 116.1(c)(1)(E).

## LEGAL STANDARD

A defendant must be detained pending trial if, after a hearing, the court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e).[9]  The government bears the burden of demonstrating that the defendant poses a danger to the community by clear and convincing evidence, or that the defendant poses a flight risk by a preponderance of the evidence.  See United States v. Rose, 2012 WL 2500497, at *1 (D. Mass. 2012) (Gorton, J.).

In making the determination for both grounds, the Court must consider the factors set out in 18 U.S.C. § 3142(g), which include the nature and circumstances of the offense charged; the weight of the evidence against defendant; defendant's character, financial resources, past conduct, and criminal history; and the nature and seriousness of the danger to any person or the community that would be posed by defendant's release. The factors set forth in 18 U.S.C. § 3142(g), compel defendant's detention on both dangerousness and risk of flight.

Where, as here, the defendant is charged with an offense described under Section 3142(e)(3), a rebuttable presumption arises of both danger to the community and risk of flight. See 18 U.S.C. § 3142(e)(3).  While the defendant bears the burden of producing evidence to rebut that presumption, the ultimate burden of proof remains with the Government.  See United States v. Gennaco, 834 F. Supp.2d 38, 40 (D. Mass. 2011) (Gorton, J.).

---

[9] As noted by the Senate Judiciary Committee: "This reference to safety of any other person is intended to cover the situation in which the *safety of a particular identifiable individual, perhaps a victim or witness*, is of concern, while the language referring to the safety of the community refers to the danger that *the defendant might engage in criminal activity to the detriment of the community*." S. Rep. No. 98-147, at 39 (1983) (emphasis added; footnotes omitted); *see also United States v. Patriarca,* 948 F.2d 789, 792–793 (1st Cir. 1991).

Additionally, the Court "permit the temporary release" of the defendant to the custody of "a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). The defendant carries the burden of showing that his release is necessary to the preparation of his defense or for another compelling reason. *See United States v. Dupree*, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011) ("A defendant has the burden of showing that temporary release is 'necessary for preparation of the person's defense' under Section 3142(i).") (citations omitted).

I.     **THE DEFENDANT IS A DANGER TO THE COMMUNITY AND A RISK OF FLIGHT**

From the violent nature of the current charges, the defendant's violent criminal history, and his violation of numerous historical probationary sentences, consideration of each and every factor supports detention of the defendant, and demonstrates that no conditions can assure the safety of the community, or assure the defendant's appearance..

A.     **NATURE AND CIRCUMSTANCES OF THE CHARGED OFFENSES**

This is a crime of violence, and the charged crimes involve the use of multiple firearms against the employee of T-Mobile, and police, and were extremely violent. See Ex. 2, p. 6-7; Tr. 7-63. Indeed, as the testimony of CW-1 makes clear, the Defendant fired his gun at the pursuing police officers, and the cruiser was at extremely close range. See Exs. 5, p. 38-43 (Darius started shooting the police five times), and 6. Moreover, the Defendant was struck with one of the bullets fired by the codefendant, Rosser-Stewart.

The charges also carry significant potential sentences not only for the underlying crime of violence (Count 2),[10] but also the mandatory minimum of ten years consecutive to that offense, for the discharge of the firearm used in the offense.  Consequently, the nature and circumstances of the charged offenses and potential penalty weigh in favor of detention, and the insufficiency of any conditions of release.

## B.    WEIGHT OF THE EVIDENCE

The weight of the evidence also overwhelmingly supports detention.  See Exs. 2, 3, 4, 5, 6, 7, 8.  The defendant's clothing at the time of the arrest was exactly the same.  Compare Ex. 2 and Ex. 8.  Put plainly, the defendant's black sweatshirt, black sweatpants, and black and white sneakers observed in both the surveillance video and during the booking video prove his involvement beyond a reasonable doubt.  This is to say nothing of the fact that the Defendant was chased from the abandoned Malibu into the woods where he was apprehended, and the firearms used in the robbery being found nearby.

To be sure, the testimony of CW-1, if called as a witness, will likely face impeachment on the same basis that essentially every cooperating witness does, including prior inconsistent statements, and promises, rewards and inducements.  The government readily acknowledges this.  However, at this juncture, CW-1 has already pled guilty, and credibly testified at a trial, where he identified the Defendant as being one of the robbers and firing at police.  See Ex. 5. The jury convicted the codefendant of conspiring with the Defendant.  Accordingly, the weight of the

---

[10] Specifically, the government calculates the total offense level for the underlying crime of violence to be at least 32, and the defendant's criminal history to be category III.  See USSG §§ 2B3.1(a) (base offense level 20); 2B3.1(b)(3)(D) (+3, victim suffered degree of injury between bodily injury and serious bodily injury); 2B3.1(b)(7)(B) (+1, loss amount $25,000); 3A1.2(c)(1) (+6, fired at officers during flight); 3C1.2 (+2, reckless endangerment during flight).  As such, if convicted as charged, the defendant faces a potential guidelines sentence range of 151-188 months, followed by 120 months for the Section 924(c) conviction.

evidence, now favorably tested before a jury, overwhelmingly favors detention of this

Defendant, who was proven at the codefendants trial to have been a shooter.

### C.      HISTORY AND CHARACTERISTICS OF THE DEFENDANT

This Court is also obliged to consider "person's character, physical and mental condition,

family ties, employment, financial resources, length of residence in the community, community

ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record

concerning appearance at court proceedings."  18 U.S.C. § 3142(g)(3)(A).

The defendant's criminal history includes two prior assault and battery police officer

convictions for which he served violated probation, numerous domestic violence arrests.  See

Exs. 8-14. Quite literally, even the prospect of a suspended sentence being imposed does not

forestall the defendant from committing new crimes.  Of note, a large proportion of his criminal

history accrued while on pretrial release or on probation. See XX.  Significantly, this case where

the Defendant fired a gun at police is also the culmination of a lifetime spent assaulting and

threatening police officers.  See Exhibit 17, p. 10 (11/14/08 incident where Darius Carter

"became extremely verbally abusive towards Officers as well as his mother the victim and his

grandmother").

During one incident on December 22, 2014, the Defendant "pushed" his mother, and the

police responded; the defendant "stepped forward and pushed the officer."  Exhibit 17, p. 14.

"While struggling to place the suspect in custody [the Defendant] shouted to the officer 'This is

why you guys are getting shot!' which the officer inferred was a reference to the murder of two

NYPD officers" that had recently taken place.  Exhibit 17, p. 14.  The defendant was charged

with assault and battery police officer (ABPO) and resisting arrest and the case was initially

continued without a finding, but was later converted to a guilty finding, and the defendant was sentenced to six months.  See Exhibit 10 (court papers for Docket No. 1407CR005788).[11]

While the defendant was on probation for the first ABPO case, on February 16, 2015, police responded to a disturbance and "Darius Carter became verbally combative with the officers and demanded that they "drag him out and arrest him." Exhibit 17, p. 20.  "While waiting for the ambulance Darius Carter became agitated and began to yell 'Fuck B-3' and 'Fuck C-11' [referring to Boston Police Division]. Darius Carter then threatened the officers by stating that he 'planned to shoot an officer' and informed the officers that he had 'an AK-47 and several bombs' in his bedroom."  Exhibit 17, p. 20.  "Darius Carter then stated that 'he would kill' any of the officers that were touching him. Darius Carter then turned his head and spit at Officer S. O'Brien striking him on the right side of his face which caused the officer to then strike his own head on the front stairwell of the residence."  Ex. 17, p. 20.  "Darius Carter continued to threaten the officers and stated that he planned to 'kill a cop tomorrow' and to 'shoot a cop when I get out'."  Exhibit 17, p. 20.  The defendant was charged with ABPO, convicted and sentenced to eighteen months suspended; the defendant violated probation.  See Exhibit 13 (court papers for Docket No. 1607CR001111).  Nevertheless, despite this leniency, the defendant has since been arrested for two more domestic violence offenses, and was the driver of a vehicle where his passenger carried a large capacity firearm with an obliterated serial number.  See Ex. 17, p. 23; Docket No. 1803CR00723.

To the government's knowledge, the defendant has no history of employment.  Indeed, the defendant has been subject to a restraining order obtained by his mother, who is his proposed third party custodian.  More disturbingly, the defendant has repeatedly assaulted members of his

---

[11] While on probation for this case, the defendant accrued four new cases.

family, including his mother, and been repeatedly arrested for other acts of domestic violence.

See Ex. 17, p. 18-19 ("[O]fficers spoke with the caller, identified as Lorie MAJOR, who stated

that her son, whom she identified as Darius CARTER, had broken her bedroom door and

assaulted her. She stated that she was attempting to stop an argument that CA[R]TER was having

with his girlfriend[,] when CARTER became enraged and 'lunged' at MAJOR with 'his fist'

before being held back by some of his unidentified friends that were present.  She stated that he

then kicked in her bedroom door and threw her large flat screen TV onto her bed.").

### D.     NATURE AND SERIOUSNESS OF DANGER POSED BY RELEASE

The evidence of the defendant's involvement in this armed robbery and shooting properly

supports a determination that the defendant presents a serious danger if released.  That this case

is the defendant's third robbery incident,[12] and the fourth shooting he has been associated with.[13]

The Defendant also has a history of violence towards his own family members that makes any

release to their custody inappropriate and potentially dangerous as well.[14]  This history

demonstrates that if released more crimes, violence, and robberies will continue.

Furthermore, his violent criminal history, convictions for assaulting police officers, and

the violent offenses for which he is currently charged more than suffice to demonstrate the

---

[12] See Docket Nos. DL05D0726 (armed robbery on 6/14/15 involving a brick) (Exhibit 17, p. 2), DL05D0760 (unarmed robbery involving Diovanni Carter) (Exhibit 17, p. 3).

[13] See Ex. 17 p. 6-7 (shooting on 5/15/07 where defendant's fingerprint found on weapon), p. 3-4 (incident on 3/7/06 where victim claimed Defendant pointed a firearm at him), p. 9-10 (incident on 9/20/08 where Defendant identified as shooter).

[14] See Exhibit 17, p. 14 (Defendant's mother reporting that "during the argument her son pushed her and took her blue iPhone cell phone"), p. 15 (Defendant's mother "reported she had no control of her son and this was an ongoing issue."), p. 22 (incident on 3/14/15, where "Officers were met outside by Karriem Lopes, who stated that his brother, Darius Carter, had punched him in the face for no reason"), p. 22 (incident on 1/19/17 where "fight became serious and his brother (Darius Carter) began choking him and striking him in the face').

14

danger that this defendant poses.  See Ex. 16.  Indeed, the defendant has flagrantly violated every

previously imposed probationary sentence through the commission of new and serious offenses.

In sum, this Defendant has proven time and again that no conditions of release can address the

danger he presents, or assure his appearance at court.[15]

## II.   THE COVID-19 PANDEMIC DOES NOT COMPEL THE DEFENDANT'S RELEASE

The   COVID-19   pandemic—while   undoubtedly   serious   and   necessitating   strong

precautionary steps, particularly in detention facilities like Wyatt Detention Facility ("Wyatt")—

has not changed the facts and circumstances particular to the Defendant that demonstrate his risk

of obstruction and danger to the community, and therefore does not warrant his release.  The

Defendant acknowledges that he does not have any underlying conditions that put him at greater

risk for complications related to COVID-19.  Cf. ECF# 223.

The Defendant's argument for release relies primarily on generalized fears about the

specter of a COVID-19 outbreak at Wyatt.  However, the Defendant's speculative concerns about

the risk to his health in the event of an outbreak do not satisfy the requirement of 18 U.S.C. §

3142(g) and they do not constitute a "compelling reason" justifying his release under 18 U.S.C. §

3142(i), particularly in light of the extensive and successful precautionary measures that Wyatt has

taken to reduce the risk of transmission.  Indeed, these measures have proven remarkably

successful with no inmates and no staff members having tested positive.

Moreover, the Defendant does not show that his proposed plan for release would in fact

mitigate his risk of contracting COVID-19, nor does he make any serious effort to show that if he

---

[15] See United States v. Carswell, 144 F.Supp. 2d 123, 138 (N.D.N.Y. 2001) ("elaborate conditions dependent upon good faith compliance are sometimes insufficient when a defendant's criminal history provides no basis for believing good faith will be forthcoming").

were to be released he would not pose a continuing danger to the community. For these reasons,

he fails to carry his burden to show that his temporary release is warranted under Section 3142(i).

The Defendant has not demonstrated that the speculative risk of a COVID-19 outbreak at

Wyatt poses a risk to his health. In his motion, he claims entitlement to release to give him "the

best chance of avoiding contracting COVID-19." D. 223, p. 11. The Government interprets this

argument to be seeking release under 18 U.S.C. § 3142(i).

Although the courts have recognized that a defendant's medical condition can be a

compelling reason justifying temporary release, they have only done so "sparingly to permit a

defendant's release where, for example, he is suffering from a terminal illness or serious injuries."

United States v. Hamilton, No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar.

20, 2020). Indeed, in the rare cases where courts have found a medical condition to be a compelling

reason for release, the defendants were actually suffering from severe medical conditions that

could not be adequately treated at their detention facilities.[16] Similarly, in other cases where the

courts have released defendants based on their medical condition, the courts emphasized that the

defendants had significant, life-threatening health problems that could not be treated in their

---

[16] See United States v. Scarpa, 815 F. Supp. 88 (E.D.N.Y. 1993) (releasing defendant who suffered from terminal AIDS that could no longer be managed by correctional authorities, where he was unlikely to survive long enough to stand trial, and "the restrictive terms of his house arrest," in connection with his physical incapacitation, "would effectively incapacitate [him] to the same extent as prison"); United States v. Cordero Caraballo, 185 F. Supp. 2d 143, 145 (D.P.R. 2002) (releasing defendant who sustained significant injuries from bullet wounds, including open wounds that required continued medical treatment that the Bureau of Prisons could not treat; the Marshal Service paid for the services of guards to supervise him; and he was unable to walk, suffered from partial paraplegia, remained in a lying position, had loss of function in his arms, and was thus not "mobile enough to roam in the community.").

detention facilities, and found that there were conditions of release that could ensure the safety of the community.[17]

By comparison, the Defendant does not argue that he has contracted COVID-19 or that he has anything that could be described as symptoms—he only raises concerns about the possibility of contracting it, even though there are no reported cases among Wyatt detainees or staff members.[18]  Nor does the Defendant claim that he would not be able to receive adequate care at Wyatt if he were to contract the virus.  This falls far short of the severe injury and urgent need to obtain care outside of a detention facility that has warranted release in other cases.  As several courts have held, the speculative risk of a COVID-19 outbreak is not a compelling reason for release under Section 3142(i)—even in cases where the defendant has an underlying medical condition that increases his or her risk of severe illness from the virus.[19]  Thus, the clear trend

---

[17] See United States v. Johnston, No. 17-00046 (RMM), 2017 WL 4277140, at *4 (D.D.C. Sept. 22, 2017) (finding that the defendant's "need for prompt cancer testing and treatment, paired with his belief" that his continued detention would delay such treatment "to a degree that imperils his life, rebuts the statutory presumption of detention," and that the court could ensure the safety of the community by imposing stringent "release conditions tailored to the nature of the charges [he] face[d] and his need for medical treatment."); United States v. Adams, No. 6:19-MJ-00087-MK, 2019 WL 3037042, at *2 (D. Or. July 10, 2019) (defendant rebutted presumption by showing "evidence of an extraordinary life-threatening medical condition the BOP cannot treat and further show[ing] the safety of the community may be reasonably assured through conditions of release.").

[18] Undersigned counsel for the Government spoke with the Wyatt Health Services Administrator on the morning of April 7, 2020 and confirmed that Wyatt had no reported cases of COVID-19 among staff or inmates. As previously noted, Wyatt has screening measures in place, and COVID-19 tests available to ensure that the facility can identify those displaying symptoms and implement measures to isolate and quarantine those individuals.  See Exhibit 20.

[19] See United States v. Hamilton, No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (denying release despite the defendant's advanced age and history of stroke and heart attack where there were no reported cases of COVID-19 at his detention facility and the Bureau of Prisons was "taking system-wide precautions to mitigate the possibility of an infection within its facilities"); United States v. Clark, No. 19-40068-01-HLT, 2020 WL 1446895, at *8 (D. Kan. Mar. 25, 2020) (denying release of defendant whose diabetes put him at increased risk of serious illness from COVID-19 where the risk of an outbreak at his facility was speculative,

among several courts that have addressed this issue is to deny temporary release, even when the defendant raises individualized risk factors based on his or her health condition, where there is only a generalized concern about the potential of a COVID-19 outbreak and the detention facility is taking reasonable measures to mitigate the risk.[20]

Accordingly, in a case like this—where the defendant raises only speculative concerns about the risk of contracting a virus, but does not currently suffer from a medical condition that requires treatment outside of the detention facility, and has made no effort to explain why his continued detention would prevent him from obtaining adequate care if he were to become sick— no compelling reason exists to grant temporary release under Section 3142(i).[21]

## CONCLUSION

The defendant presents a significant danger to the community, a serious risk of flight, and a serious risk of obstructing justice.  No conditions can assure the safety of the community or his

---

he did not show that his proposed release plan would reduce his overall risk, and his release would put pretrial services and law enforcement at increased risk); United States v. Lunnie, No. 4:19-CR-00180 KGB, 2020 WL 1644495, at *5 (E.D. Ark. Apr. 2, 2020) (COVID-19 was not a compelling reason warranting release under 18 U.S.C. § 3142(i) where the defendant's arguments about a potential outbreak at his facility were speculative, he failed to show that his "lifelong bouts with bronchitis" increased his risk of severe illness if he were to contract COVID-19, and he did not demonstrate that "his proposed release plan would necessarily alleviate his overall COVID-19 risks," or the risks to the community).

[20] See United States v. Martin, No. CR PWG-19-140-13, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020) (finding that the COVID-19 pandemic was not new information warranting release under 18 U.S.C. § 3142(f)(2)(B), explaining: "while the record confirms that Martin has disclosed that he suffers from asthma, high blood pressure, and diabetes, this alone is insufficient to rebut the proffer by the Government that the correctional and medical staff at CDC are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus.").

[21] See United States v. Rebollo-Andino, 312 F. App'x 346, 348 (1st Cir. 2009) (declining to reverse denial of motion for release based on health conditions under 18 U.S.C. § 3142(i) where the defendant did not identify any specific medical conditions and failed to "explain why his detention would prevent him from obtaining adequate treatment" for any condition that he did have).

return to Court.  Additionally, the Defendant does not suffer from any particular condition that

places him at risk for complications from the COVID-19 pandemic and release is not warranted

on those grounds.  As such, the defendant must be detained until trial, which is less than sixty

days from now.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:     */s/ Philip A. Mallard*
        Philip A. Mallard
        Assistant U.S. Attorney
        United States Attorney's Office
        1 Courthouse Way, Suite 9200
        Boston MA 02210
        617-748-3674

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be
sent electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF).

*/s/ Philip A. Mallard*
Philip A. Mallard
Assistant U.S. Attorney

Date: April 9, 2020